1  **TAYLOR SETHI LACHOWICZ LLP**
   Matthew D. Taylor  (SBN 220032)
2  333 S. Hope Street, Suite 2620
   Los Angeles, California 90071
3  Telephone: (213) 254-2455
   Facsimile:  (213) 995-5414
4  E-mail:  mtaylor@taylorsethi.com

5  Attorney for Defendant and Cross-Claimant
   ALEXANDER KOTLER, M.D.

6

7

8              **UNITED STATES DISTRICT COURT**

9      **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

10

11  ALEXSANDRA PILAVSKAYA, an          Case No. CV 11-04075-CAS (Ex)
    individual,
12                                     [Hon. Christina A. Snyder]
            Plaintiff,
13                                     **NOTICE OF MOTION AND**
         v.                            **MOTION FOR ORDER**
14                                     **AMENDING PRE-TRIAL**
    JAMES  HENDERSON, JR., an individual, **SCHEDULING ORDER AND FOR**
15  and ALEXANDER KOTLER, M.D., an     **LEAVE TO FILE AMENDED**
    individual,                        **CROSS-CLAIM;**
16                                     **DECLARATIONS OF MATTHEW**
            Defendants.                **D. TAYLOR AND ALEXANDER**
17                                     **KOTLER, M.D. IN SUPPORT**
                                       **THEREOF**
18

19

20                                     Date:        August 6, 2012
                                       Time:        10:00 a.m.
21                                     Courtroom:. 5

22

23  AND RELATED CROSS-CLAIMS

24

25

26

27

28

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on August 6, 2012 at 10:00 a.m., or as soon thereafter as the matter may be heard, before the Honorable Christina A. Snyder, in Courtroom 5 of the above-captioned court, located at 312 N. Spring Street Hill Street, Los Angeles, California 90012, Defendant and Cross-Claimant Alexander Kotler, M.D. ("Kotler") will and hereby does move this Court for an order amending the pretrial scheduling order in this case so as to permit the immediate filing of an amended cross-claim adding two additional cross-defendants- Bert Rhine and James Henderson, Sr. and certain limited factual allegations related thereto.

This Motion is made pursuant to Rules 16(b)(4) and Rule 15(a)(2) of the Federal Rules of Civil Procedure, on the grounds that "good cause" exists to amend the pretrial scheduling order so as to allow the addition of two cross-defendants in this case and that leave to amend should be granted in the interest of justice.

The motion will be based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities and the Declarations of Matthew D. Taylor and Alexander Kotler, M.D., and exhibits thereto, the complete records and files in this action, and such other evidence and argument as the Court shall permit at the hearing of the motion.

DATED:     JULY 5, 2012          **TAYLOR SETHI LACHOWICZ LLP**

By: _____
          Matthew D. Taylor
Attorney for Defendant and Cross-Claimant
ALEXANDER KOTLER, M.D.

MOTION TO AMEND PRETRIAL SCHEDULING ORDER AND
FOR LEAVE TO FILE AMENDED CROSS-CLAIM

1    **I.    INTRODUCTION**

2         Defendant and Cross-Claimant Alexander Kotler, M.D. ("Kotler") brings the

3    present motion to amend his cross-complaint to add two additional cross-defendants-

4    Bert Rhine and James Henderson, Sr.- and to add certain, very limited factual

5    allegations related to these two defendants.  Allegations related to preexisting

6    defendants have been left entirely unchanged.

7         Evidence implicating these two new cross-defendants in the same improper

8    conduct already alleged in the existing Cross-Claim only recently came to light.  Thus,

9    despite the fact that the deadline set in the Court's November 2011 scheduling order

10   for requesting leave to amend has passed, "good cause" exists for amending this order

11   to allow Kotler to amend his cross-claim, since any delay in bringing these

12   amendments is justified and since justice and judicial economy would be served by

13   bringing all defendants properly before the Court as part of a single action.

14

15   **II.    PROCEDURAL BACKGROUND**

16        The present case was filed on May 12, 2012 and Kotler filed his cross-claim on

17   September 13, 2011.  At the November 21, 2011 scheduling conference, the court set a

18   trial date of August 28, 2012 and set January 13, 2012 as the last date to request leave

19   to file and amended pleading.  (Taylor Decl., Exh. D.)  On April 16, 2012, pursuant to

20   stipulation among the parties, the Court set a new trial date of November 27, 2012,

21   although no change was made to the previous deadline for requesting leave to file an

22   amended complaint.  (Taylor Decl., ¶ 5; Exh. E.)

23        On June 13, 2012, Kotler's counsel informed opposing counsel that it

24   intended to file an amended complaint adding Mssrs. Rhine and Henderson, Sr. as

25   defendants in this matter and requested that they stipulate to the filing of an amended

26   cross-complaint in order to avoid the need to file a motion.  (Taylor Decl., ¶ 4; Exh. C.)

27   Kotler's counsel received no response to this request.  (*Id.*)  And, on July 5, 2012,

28

MOTION TO AMEND PRETRIAL SCHEDULING ORDER AND
FOR LEAVE TO FILE AMENDED CROSS-CLAIM

1  Kotler's counsel met and conferred by telephone with opposing counsel to discuss the

2  present motion. (Taylor Dec., ¶ 7.)  Opposing counsel was unwilling to stipulate to

3  either an amendment to the pretrial scheduling order or to the filing of the amended

4  cross-claim, itself.  (*Id.*)

5

6  **III.    LEGAL ARGUMENT**

7          a.  Leave To Amend Is Within The Sound Discretion of the Court And Is To

8             Be Freely Granted.

9        Federal Rule of Civil Procedure 15(a) provides that a party may amend their

10  complaint once "as a matter of course" before a responsive pleading is served.  After

11  that the "party may amend the party's pleading only by leave of court or by written

12  consent of the adverse party and leave shall be freely given when justice so requires."

13  Fed.R.Civ.P. 15(a).  Thus "after a brief period in which a party may amend as of

14  right," leave to amend lies "within the sound discretion of the trial court." *United*

15  *States v. Webb*, 655 F.2d 977, 979 (9th Cir.1981).

16        Leave to amend a pleading "shall be freely given when justice so requires," and

17  this policy is to be applied with extreme liberality. See *DCD Programs, Ltd. v.*

18  *Leighton*, 833 F.2d 183, 186 (9th Cir.1987). Federal policy strongly favors

19  determination of cases on their merits.  Therefore, the role of pleadings is limited, and

20  leave to amend the pleadings is freely given unless the opposing party makes a

21  showing of undue prejudice, or bad faith or dilatory motive on the part of the moving

22  party. *Foman v. Davis*, 371 US 178, 182 (1962).

23        Four factors are commonly used to determine the propriety of a motion for leave

24  to amend.  These are: bad faith, undue delay, prejudice to the opposing party, and

25  futility of amendment. *Loehr v. Ventura County Community College District*, 743 F.2d

26  1310, 1319 (9th Cir.1996).  These factors, however, are not of equal weight in that

27  delay, by itself, is insufficient to justify denial of leave to amend. *Webb*, 655 F.2d at

28

980.  Where, as here, a party seeks to amend a pleading after the deadline set forth for doing so in the pretrial scheduling order, leave of court and a showing of "good cause" is required.  *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000).

        b.  <u>Good Cause Exists To Add Bert Rhine As A Cross-Defendant In This Matter.</u>

Kotler seeks to add Bert Rhine as a cross-defendant.  The proposed amended cross-claim alleges, *inter alia*, that Rhine "misappropriated approximately $33,000 belonging to [Cloud Nine Entertainment] for his own personal use."  (Taylor Decl. Exh. A (Proposed Amended Cross-Claim) ¶ 26.)  Any delay in bringing the claims against Rhine is fully justified due to the fact that it only recently came to Kotler's attention that Rhine had misappropriated the funds at issue.  (Taylor Decl. ¶ 3; Kotler Decl. ¶ 2.)

        c.  <u>Good Cause Exists To Add James Henderson, Sr. As A Cross-Defendant In This Matter.</u>

Similarly, Kotler also seeks to add James Henderson Sr. ("Henderson Sr.") as a cross-defendant.  The proposed amended cross-claim alleges, *inter alia*, that Henderson Sr. conspired with other defendants to forge Kotler's signature on various documents allowing them to take control of all company funds, funds they subsequently used for their own personal benefit.  (Proposed Amended Cross-Claim ¶ 23.)  Similar to the claims against Rhine, Kotler only recently learned of Henderson Sr.'s role in this fraud as a result of reviewing the deposition testimony of Anita O'Connor and the letter sent by Bert Rhine.  (Kotler Decl. ¶ 3.)

## IV.  <u>CONCLUSION</u>

For all of the foregoing reasons, Kotler respectfully request that the Court

MOTION TO AMEND PRETRIAL SCHEDULING ORDER AND
FOR LEAVE TO FILE AMENDED CROSS-CLAIM

1   amend its pretrial scheduling order to permit Kotler to request leave to file an amended

2   cross-claim and that such leave be granted.

3

4

DATED:     JULY 5, 2012                    **TAYLOR SETHI LACHOWICZ LLP**

5

6

By: _____

7

Matthew D. Taylor

8   Attorney for Defendant and Cross-Claimant
    ALEXANDER KOTLER, M.D.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>DECLARATION OF MATTHEW D. TAYLOR</u>

I, Matthew D. Taylor, declare as follows:

1.      I am an attorney licensed to practice law in the State of California and am a partner in the firm of Taylor Sethi Lachowicz LLP, counsel for defendant and cross-claimant Alexander Kotler, M.D.  I have personal knowledge of the facts set forth in this Declaration, and if called as a witness, could and would testify competently to such facts under oath.

2.      Attached hereto as Exhibit A is a true and correct copy of the proposed amended cross-complaint in this action.

3.      Attached hereto as Exhibit B is a true and correct copy of an email (with attachment) that I received from Ed Towle on or about May 16, 2012.  Mr. Towle is counsel for cross-defendant James Henderson Jr. in the present action.  Prior to receiving this email, neither I not my client had any specific knowledge that Bert Rhine had misappropriated funds belonging to Cloud Nine Entertainment, Inc. ("Cloud Nine") for his own personal benefit.

4.      Attached hereto as Exhibit C is a true and correct copy of the email that I sent to all opposing counsel on June 13, 2012.  This email attached a copy of the proposed amended cross-complaint that was identical to the one attached hereto as Exhibit A.  I never received a response to this email.

5.      Although I was not personally present at such conference, I am informed and believe that at the November 21, 2011 scheduling conference in this case, the court set a trial date of August 28, 2012 and set January 13, 2012 as the last date to request leave to file and amended pleading.  Attached hereto as Exhibit D is a true and correct copy of what I believe to be the minutes from this conference, which I have downloaded from the Court's PACER system.

6.      On April 16, 2012, pursuant to stipulation among the parties, the Court set a new trial date of November 27, 2012 although no change was made to the previous

MOTION TO AMEND PRETRIAL SCHEDULING ORDER AND
FOR LEAVE TO FILE AMENDED CROSS-CLAIM

1   deadline for requesting leave to file and amended complaint.  Attached hereto as Exhibit

2   E is a true and correct copy of this order.

3       7.    On July 5, 2012, I met and conferred by telephone with opposing counsel

4   Ed Towle and John Andrews to discuss the present motion.  Opposing counsel was

5   unwilling to stipulate to the filing of the amended cross-claim.

6       I declare under penalty of perjury under the laws of the State of California and the

7   United States of America that the foregoing is true and correct.

8       Executed this 5th day of July 2012, at Los Angeles, California.

9

10

11

12   MATTHEW D. TAYLOR

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION TO AMEND PRETRIAL SCHEDULING ORDER AND
FOR LEAVE TO FILE AMENDED CROSS-CLAIM

# Exhibit A

**TAYLOR SETHI LACHOWICZ LLP**
Matthew D. Taylor  (SBN 220032)
333 S. Hope Street, Suite 2620
Los Angeles, California 90071
Telephone: (213) 254-2455
Facsimile:  (213) 995-5414
E-mail:  mtaylor@taylorsethi.com

Attorney for Defendant and Cross-Claimant
ALEXANDER KOTLER, M.D.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALEXSANDRA PILAVSKAYA, an individual, <br><br> Plaintiff, <br><br> v. <br><br> JAMES  HENDERSON, JR., an individual, and ALEXANDER KOTLER, M.D., an individual, <br><br> Defendants. | Case No. CV 11-04075-CAS (Ex) <br><br> **AMENDED CROSS-CLAIM OF ALEXANDER KOTLER, M.D.; DEMAND FOR JURY TRIAL** |
| ALEXANDER KOTLER, M.D., an individual, <br><br> Cross-claimant, <br><br> v. <br><br> JAMES  HENDERSON, JR., an individual, JAMES HENDERSON, SR., an individual, and BERT RHINE, an individual; and DOES 1-10, <br><br> Cross-Defendants. | |

1       Cross-claimant Plaintiff ALEXANDER KOTLER, M.D. ("Kotler") cross-claims

2   and alleges as follows:

3   **JURISDICTION**

4       1.    This Court has supplemental jurisdiction over this cross-claim under 28

5   U.S.C § 1367(a), because it arises out of the same transactions and occurrences as alleged

6   in Plaintiffs Complaint, so as to form a part of the same case or controversy.

7   **FACTS**

8       2.    Kotler is, and at all times mentioned herein was, an individual and a resident

9   of Los Angeles, California.

10       3.    The plaintiff in this action is Aleksandra Pilyavskaya ("Pilyavskaya").

11       4.    Cross-Defendant James Henderson, Jr. ("Henderson, Jr.") is, and at all times

12   mentioned herein was, an individual residing in Los Angeles, California and licensed to

13   engage in the practice of law in the State of California, and was practicing law at 2530

14   Wilshire Boulevard, 2nd Floor, Santa Monica, California 90403, and is a defendant and

15   cross-defendant in this action.  Henderson, Jr. was Kotler's son-in-law until January 2011.

16       5.    Cross-Defendant James Henderson, Sr. ("Henderson, Sr.") is, and at all times

17   mentioned herein was, an individual residing in Los Angeles, California and licensed to

18   engage in the practice of law in the State of California, and was practicing law at 2530

19   Wilshire Boulevard, 2nd Floor, Santa Monica, California 90403.  Henderson, Sr. is

20   Henderson, Jr.'s father and was Kotler's in-law until January 2011.

21       6.    Cross-Defendant Bert Rhine is, and at all times mentioned herein was, an

22   individual residing in Poway, California.

23       7.    Kotler is ignorant of the true names and capacities of cross-defendants sued

24   herein as DOES 1 through 10, inclusive, and, therefore sues these parties by such fictitious

25   names. Kotler will amend the cross-claim to allege their true names and capacities when

26   ascertained. Kotler is informed and believes and thereon alleges that each of the fictitiously

27

28

1  named parties is responsible in some manner for, and proximately caused the damages to

2  Kotler as hereinafter set forth.

3      8.     Kotler is informed and believes and thereon alleges that at all times

4  mentioned herein, cross-defendants and each of them, were the agents, employees,

5  servants and representatives of the remaining cross-defendants, and were at all times

6  mentioned herein, acting within the purpose and scope of such agency, employment or

7  contract.

8      9.     In approximately August 2008, Henderson, Jr., Kotler's then son-in-law,

9  presented Kotler with a business plan for a project called Cloud Nine Entertainment

10 ("CNE"). The project was a huge helium-filled balloon to be installed as an amusement

11 ride ("balloon project").  Henderson, Jr. told Kotler that Henderson, Jr. would be the Chief

12 Financial Officer of CNE, as well as its General Counsel. The plan appealed to Kotler

13 because Henderson, Jr., his son-in-law, stated that Henderson, Jr. would be the CFO of the

14 company and would oversee the investment; stated that there was a principal investor who

15 had already invested $2.4 million; showed Kotler the business plan for the balloon project;

16 discussed the corporate structure of CNE; and explained the structure of payment to

17 investors.

18     10.    Kotler had complete trust and confidence in Henderson, Jr., both because of

19 the family relationship but also because Henderson, Jr., was acting as Kotler's attorney

20 with regard to the transaction and investment.

21     11.    Kotler, trusting Henderson, Jr., and in reliance on his representations,

22 decided to invest $600,000 of his own money in the project, funds that he had earned over

23 his lifetime from his successful medical practice. Henderson, Jr. prepared the contracts

24 between CNE and Kotler and advised Kotler to sign them.  Prior to and at the time of the

25 signing of the contract, Henderson, Jr. was acting in his capacity as Kotler's attorney. Per

26 Henderson, Ir.'s advice, Kotler then obtained cashier's checks totaling the amount of

27

28

1  $600,000 all of which was to be his investment in the balloon project but was to be payable
2  to the "James Henderson, Jr. Client Trust Account."

3       12.    Henderson, Jr., never disclosed any conflict of interest and never sought or
4  obtained an informed written consent from Kotler to represent both Kotler and CNE.

5       13.    As time passed, Kotler was not informed of the status of the project.  No
6  budget or expenses were presented.  Kotler began to make inquiries but was never able to
7  obtain a clear response.

8       14.    The balloon attraction was eventually opened in Las Vegas in October 2009.
9  When Kotler arrived for the opening, he became even more concerned, as the amount that
10  he had been told had been spent on the project was not reflected in the attraction.
11  Henderson, Jr. advised Kotler that all the money provided by investors had been spent on
12  the project, but Henderson, Jr. could not and did not present Kotler with any itemized list
13  of the expenses, despite repeated requests over the next several months.  Kotler suspected
14  that there was mismanagement and misappropriation of funds, but could not obtain any
15  information from Henderson, Jr.

16       15.    Due to Kotler's concern for his investment, in December 2009, Kotler
17  decided to move to Las Vegas and attempt to manage the balloon project himself in order
18  to save at least a portion of the investors' funds.  Upon his arrival, he was shocked to see
19  how badly the business had been mismanaged.  When he arrived at CNE, he first met
20  Anita O'Connor (aka Anita Chanthasavath) ("O'Connor") who was working for CNE as a
21  marketing director.

22       16.    Kotler made drastic changes, including firing five of the managers, firing all
23  but three of the 14 hostesses and firing all but four of the eight pilots.  O'Connor continued
24  to work for CNE, but her duties were somewhat expanded to include marketing as well as
25  administrative functions.  Kotler began to actively look for marketing opportunities, and
26  managed to sign contracts with major companies, including Expedia and vegas.com.

27

28

17.     On March 18, 2010, there was a wind accident during which the balloon sustained major damage and was virtually destroyed.  Kotler's suggestion at that point was to obtain the insurance proceeds and to also file a products liability action against the balloon manufacturer in an effort to recover the investors' funds.  However, the principal investor decided to purchase another balloon by using the insurance funds and his own additional investment.  The company proceeded with this plan without the participation or agreement of any of the other investors. The project was eventually closed.

18.     Immediately after the accident, when the claim was filed with the insurance company, Kotler opened a separate bank account at Nevada State Bank ("Bank") to deposit all of the insurance proceeds, so that it would not be commingled with the rest of the company's funds.  His intent was to disburse the insurance proceeds to the investors (himself, Pilyavskaya and nonparty Ron Sacco) proportionate to their investments.

19.     During the period of January 2010 to December 2010, O'Connor, in her capacity as marketing and administrative assistant, had access to Kotler's personal and financial information, including but not limited to driver's license, Social Security number, mother's maiden name and bank account numbers.  O'Connor also had access to all of Kotler's mail, including all statements and other correspondence from the Bank.  O'Connor also had access to the checkbooks for all of Kotler's bank accounts. Due to her unlimited access to all mail and bank documents, upon information and belief, Kotler alleges that O'Connor altered statements sent by the Bank to reflect substantially higher balances than were remaining in the accounts.

20.     Kotler personally received and Anita O'Connor deposited two checks in the amounts of $35,000 and $250,000.  He was informed by the insurance company that a third check would be issued in the amount of approximately $360,000.  Two weeks later Kotler was informed by O'Connor that the third check had been diverted and went directly to Henderson, Jr. and Henderson, Sr.  Both Hendersons are also members of CNE's board of directors, but neither one had invested any funds in the project at any time.  Dr. Kotler

1   flew to Los Angeles and confronted the Hendersons about the diversion of the proceeds

2   but was not provided with a satisfactory explanation.

3       21.    At this point, Kotler decided to remove himself from actively participating in

4   this project, as he did not feel that his opinion was being considered.  By that time,

5   approximately $40,000 to $50,000 of the insurance proceeds had been spent on various

6   CNE-related business expenses.  Additionally, Kotler had expended approximately

7   $100,000 of his own funds for living and other expenses.

8       22.    After returning to Los Angeles, Kotler wrote a check for the full amount of

9   the funds (approximately $211,000.00) located in the CNE bank account in Las Vegas,

10  with the intent of disbursing the funds to Pilyavskaya and himself proportionate to their

11  investments.  The check bounced.  He asked O'Connor, who had remained in Las Vegas, to

12  advise him of the exact amount of the balance, so that he could write a check to transfer

13  the funds to Los Angeles and then disburse the funds to himself and Pilyavskaya.  The

14  second check bounced also.  Kotler then flew to Las Vegas and went directly to the Bank

15  of Nevada where the CNE accounts were based.  He was informed that the account was

16  not only empty but overdrawn by approximately $300.

17      23.    Over the next several weeks, Kotler obtained all the bank statements, as well

18  as copies of checks from the CNE accounts.  It was at that point that he discovered that

19  O'Connor had misappropriated all the funds from the accounts.  He also learned that all

20  three checks ($35,000, $250,000 and $361,000) had been deposited to the account opened

21  by Kotler for the insurance proceeds and that (contrary to what O'Connor had told him) no

22  check had been diverted.  Instead, at the direction of Henderson, Jr. and Henderson, Sr.,

23  O'Connor had deposited the third check and then wrote a check in the amount of $316,000,

24  forged Kotler's signature and sent the check to the Hendersons.  Thus, at the time Dr.

25  Kotler confronted the Hendersons about a check that Kotler believed had been diverted,

26  the Henderson, Jr. and Henderson, Sr. were aware that the check in the amount of

27  $316,000 that they received was a forged check.  The remainder of the funds in the amount

28

AMENDED CROSS-CLAIM

1  of $211,000 was embezzled via Internet transfers, forged checks and withdrawal slips in

2  smaller increments by O'Connor.  Kotler does not have knowledge of what O'Connor,

3  Henderson, Jr., and/or  Henderson, Sr. did with the funds.

4      24.    Kotler filed a report with the Las Vegas Metropolitan Police on December

5  14, 2010, and the investigation is still pending.

6      25.    Since this occurred, Kotler has had no communication with any of the board

7  members and is unaware of the current status of the first or second balloon or the

8  equipment for which the company paid over $1,300,000.  Kotler also believes that

9  additional funds from the insurance company have been received by Henderson, Jr. and/or

10  Henderson, Sr., but he does not know the exact amount and how it was spent or otherwise

11  disbursed.  Similarly, Kotler is informed and believes that Henderson, Jr., Henderson, Sr.

12  and Rhine passed various board resolutions, including the removal of Kotler from the

13  Board and the re-instatement of Henderson, Jr. to the Board, without the approval or even

14  vote of the other board members (including Kotler).

15      26.    In May 2012, Kotler became aware that cross-defendant Bert Rhine had

16  misappropriated approximately $33,000 belonging to CNE for his own personal use.

17      27.    Pilyavskaya filed the Complaint in this action against Kotler and Henderson,

18  Jr., based on the wrongful acts of Henderson, Jr. and others.

19      28.    Pilyavskaya has alleged that Kotler was involved in or had knowledge of

20  those wrongful acts.

21      29.    Kotler has answered Pilyavskaya's Complaint, denying the Complaint as to

22  Kotler.

23  **FIRST CLAIM FOR RELIEF**

24  **(For Conversion)**

25  **(Against All Cross-Defendants)**

26      30.    Kotler realleges, as if set forth in full herein, paragraphs 1 through 29 above,

27  inclusive.

28

31.     Kotler is, and at all times relevant hereto was, the owner of or entitled to possess the funds contained in three separate bank accounts at Nevada State Bank, in the total amount of approximately $601,000.  Kotler is, and at all times relevant hereto was, the owner of or entitled to possess the funds that he gave to Henderson, Jr. via certified checks in the amount of $600,000.

32.     As set forth above, Henderson, Jr., Henderson Sr., Rhine and Does, misappropriated hundreds of thousands of dollars in funds that were deposited in the Bank's accounts and that were given by Kotler to Henderson, Jr. and belonged to him and Pilyavskaya.

33.     The wrongful acts described in this cross-claim by the cross-defendants O'Connor and each of them in stealing, embezzling and misappropriating Kotler's funds were done in furtherance of a conspiracy to defraud and cheat Kotler and to misappropriate, embezzle and steal Kotler's funds.  Upon information and belief, the last overt act of the cross-defendants involved in this conspiracy occurred in or about December 2010 and continuing thereafter.

34.     This conduct is improper and constitutes conversion of property that does not belong to these parties. As a result of this conversion, Kotler has been damaged in the amount of hundreds of thousands of dollars and Kotler seeks return of all misappropriated funds according to proof at trial.

35.     Kotler is also entitled to compensation for the time and money expended in pursuit of the property.

36.     In doing the acts herein alleged, these parties acted with oppression, fraud, malice, and in conscious disregard of the rights of Kotler, and Kotler is entitled to punitive damages according to proof at trial.

**<u>SECOND CLAIM FOR RELIEF</u>**

**(For Deceit- Intentional Fraud)**

**(Against All Cross-Defendants)**

37. The allegations in paragraph 1 through 36 are incorporated herein by this reference.

38. Kotler alleges on information and belief that Henderson, Jr., Henderson, Sr., Rhine, O'Connor and each of them conspired together to defraud Kotler and to misappropriate the hundreds of thousands of dollars given by Kotler to Henderson, Jr. and in Kotler's accounts as alleged herein.

39. The wrongful acts described in this pleading by the cross-defendants and each of them in stealing, embezzling and misappropriating Kotler's funds were done in furtherance of a conspiracy to defraud and cheat Kotler and to misappropriate, embezzle and steal Kotler's funds. Upon information and belief, the last overt act of the cross-defendants involved in this conspiracy occurred on or about December 2010 and continuing thereafter.

40. Henderson, Jr. made the following representations to Kotler:

    a. That he would oversee Kotler's investment in CNE in his position as the CFO;

    b. That no conflict of interest existed in Henderson, Jr.'s simultaneous representation of Kotler, the principal investor (Ron Sacco) and CNE;

    c. That he would make an accounting to Kotler for all funds expended in the operation of the balloon attraction;

    d. That he and CNE had completed due diligence with respect to all aspects of the operation of the balloon attraction, including but not limited to, completing background checks of all employees and 4 managers;

    e. That the purpose of the balloon attraction was to make a profit;

    f. That the primary investor has invested funds with the purpose of potentially making a profit;

    g. That the funds Kotler had given to Henderson, Jr. would be appropriately invested in the balloon project; and

h. That he was unaware of the $316,000 check forged by O'Connor, which constituted payment from the insurance company.

41.     Henderson, Sr. made the following representations to Kotler:

a. That he was unaware of the $316,000 check forged by O'Connor, which constituted payment from the insurance company.

42.     During the course of the business venture, as described above, Henderson, Jr. and Does 4-6 caused certain documents to be prepared on behalf of CNE. Such documents were purported to be prepared on behalf of an entity called Cloud Nine Entertainment, LLC. However, no such entity was ever formed with the Secretary of State of Nevada, California or Delaware. However, cross-defendants caused the preparation and submission of K1 forms for this non-existent entity.

43.     At the time cross-defendant Henderson, Jr. and Henderson, Sr. made these representations, they knew them to be false and made these representations with the intention to defraud and deceive Kotler and induce Kotler to act in reliance on these representations in the manner described herein, or with the expectation that Kotler would so act.

44.     Kotler, at the time these representations were made by Henderson, Jr. and Henderson, Sr. and at the time Kotler took the actions alleged herein, was ignorant of the falsity of cross-defendants Henderson, Jr. and Henderson, Sr.'s representations and believed them to be true. In reliance on these representations, Kotler was induced to and did give $600,000 (in the form of cashier's checks to Henderson, Jr.'s Client trust account) to Henderson, Jr., continue to employ O'Connor allowing her to proceed with the theft of the Bank funds and allow O'Connor access to his mail, checkbooks and other information. Had Kotler known the actual facts, he would not have taken such action. Kotler's reliance had been justified because cross-defendant Henderson, Jr. was Kotler's son-in-law, Kotler's attorney and CFO of CNE and cross-defendant Henderson, Sr. was an attorney, board member of CNE and Kotler's in-law.

AMENDED CROSS-CLAIM

45.   As a legal and proximate result of the wrongful acts alleged herein performed pursuant to the conspiracy, Kotler has suffered damages in an amount which will be proved at trial.

46.   In doing the acts alleged herein pursuant to their conspiracy, these parties and each of them acted willfully and with the intent to cause injury to Kotler. These parties acted with fraud, malice, oppression and in conscious disregard of Kotler's rights and acted to vex, harass and harm.

47.   As a result, Kotler is entitled to an award of punitive and exemplary damages in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

### (For Deceit- Negligent Misrepresentation)

### (Against All Cross-Defendants)

48.   The allegations in paragraph 1 through 47 are incorporated herein by this reference.

49.   Kotler alleges on information and belief that Henderson, Jr., Henderson Sr., O'Connor, Rhine and each of them conspired together to defraud Kotler and to misappropriate the hundreds of thousands of dollars given by Kotler to Henderson, Jr. and in Kotler's accounts as alleged herein.

50.   The wrongful acts described in this pleading by the cross-defendants and each of them in stealing, embezzling and misappropriating Kotler's funds were done in furtherance of a conspiracy to defraud and cheat Kotler and to misappropriate, embezzle and steal Kotler's funds.  Upon information and belief, the last overt act of the cross-defendants involved in this conspiracy occurred on or about December 2010 and continuing thereafter.

51.   Henderson, Jr. made the following representations to Kotler:

    a.  That he would oversee Kotler's investment in CNE in his position as the CFO;

b. That no conflict of interest existed in Henderson, Jr.'s simultaneous representation of Kotler, the principal investor (Ron Sacco) and CNE;

c. That he would make an accounting to Kotler for all funds expended in the operation of the balloon attraction;

d. That he and CNE had completed due diligence with respect to all aspects of the operation of the balloon attraction, including but not limited to, completing background checks of all employees and managers;

e. That the purpose of the balloon attraction was to make a profit;

f. That the primary investor has invested funds with the purpose of potentially making a profit;

g. That the funds Kotler had given to Henderson, Jr. would be appropriately invested in the balloon project; and

h. That he was unaware of the $316,000 check forged by O'Connor, which constituted payment from the insurance company;

52. Henderson, Sr. made the following representations to Kotler:

a. That he was unaware of the $316,000 check forged by O'Connor, which constituted payment from the insurance company.

53. During the course of the business venture, as described above, Henderson, Jr. and Does 4-6 caused certain documents to be prepared on behalf of CNE. Such documents were purported to be prepared on behalf of an entity called Cloud Nine Entertainment, LLC. However, no such entity was ever formed with the Secretary of State of Nevada, California or Delaware. Nonetheless, cross-defendants caused the preparation and submission of K1 forms for this non-existent entity. Additionally, corporate funds were purportedly paid to an attorney for the alleged preparation of documents to covert the corporation into a Limited Liability Corporation.

54.     Henderson, Jr. and Henderson, Sr. were negligent in making these representations because they had no reason to believe them to be true at the time they made them.

55.     Kotler, at the time these representations were made by Henderson, Jr. and Henderson, Sr. and at the time Kotler took the actions alleged herein, was ignorant of the falsity of cross-defendants Henderson, Jr. and Henderson, Sr.'s representations and believed them to be true.   In reliance on these representations, Kotler was induced to and did give $600,000 (in the form of cashier's checks to Henderson, Jr.'s Client trust account) to Henderson, Jr., continue to employ O'Connor allowing her to proceed with the theft of the Bank funds and allow O'Connor access to his mail, checkbooks and other information. Had Kotler known the actual facts, he would not have taken such action.  Kotler's reliance had been justified because cross-defendant Henderson, Jr. was Kotler's son-in-law, Kotler's attorney and CFO of CNE and cross-defendant Henderson, Sr. was an attorney, board member of CNE and Kotler's in-law.

56.     As a legal and proximate result of the wrongful acts alleged herein performed pursuant to the conspiracy, Kotler has suffered damages in an amount which will be proved at trial.

57.     In doing the acts alleged herein pursuant to their conspiracy, these parties and each of them acted willfully and with the intent to cause injury to Kotler. These parties acted with fraud, malice, oppression and in conscious disregard of Kotler's rights and acted to vex, harass and harm.

58.     As a result, Kotler is entitled to an award of punitive and exemplary damages in an amount to be determined at trial.

## **FOURTH CLAIM FOR RELIEF**

### **(Deceit- Constructive Fraud)**

### **(Against All Cross-Defendants)**

- 13 -

AMENDED CROSS-CLAIM

59.     The allegations in paragraphs 1 through 58 are incorporated herein by this reference.

60.     Henderson, Jr. was Kotler's attorney and the CFO of CNE.  In these positions, Henderson, Jr. owed fiduciary obligations to Kotler.

61.     In addition, Henderson, Jr. was managing and utilizing monies provided to Henderson, Jr. by Kotler.  As such, Henderson, Jr. owed a fiduciary obligation to Kotler to manage and utilize these monies appropriately and solely for the purpose of advancing legitimate interests.  In essence, Henderson, Jr. held these monies in trust and as such owed fiduciary duties to Kotler to appropriately and fairly utilize and distribute the funds.

62.     At all relevant times, Rhine and Henderson Sr. were Directors of CNE.  In this position, they owed fiduciary obligations to both CNE and its investors, including Kotler.

63.     Henderson, Jr., Henderson, Sr. and Rhine breached their fiduciary duties by committing the acts set forth above, specifically by misappropriating hundreds of thousands of dollars properly belonging to CNE and by failing to properly report or account for the use of these funds.

64.     Upon information and belief, in committing the wrongful acts described herein, Henderson Jr. received substantial assistance from his father, Henderson Sr., who was aware of the fiduciary duties owed by his son at all relevant times and who provided such assistance in furtherance of a conspiracy to defraud and cheat Kotler and to misappropriate, embezzle and steal Kotler's funds. Upon information and belief, the last overt act of the cross-defendants involved in the conspiracy occurred on or about December 2010 and continuing thereafter.

65.     As a direct, legal and proximate result of the breach of fiduciary duties by the cross-defendants, and each of them, Kotler has been damaged in the loss of hundreds of thousands of dollars, an amount that is in excess of the jurisdictional minimum of this court.

- 14 -
AMENDED CROSS-CLAIM

66.     In committing the acts alleged herein, these cross-defendants acted with full knowledge and with reckless disregard for the consequences and damages being caused to the Kotler. The conduct of these cross-defendants, and each of them, was willful, reckless, malicious, fraudulent and oppressive such that Kotler is entitled to an award of punitive damages against each cross-defendant in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

### (Against All Cross-Defendants)

67.     The allegations in paragraphs 1 through 66 are incorporated herein by this reference.

68.     Defendant Henderson, Jr. was Kotler's attorney and the CFO of CNE.  Does 1 to 3 were also in positions of authority at CNE. In these positions, cross-defendants owed fiduciary obligations to Kotler.

69.     In addition, Henderson, Jr. and Does 1 to 3 were managing and utilizing monies provided to Henderson, Jr. by Kotler. As such, cross-defendants owed a fiduciary obligation to Kotler to manage and utilize these monies appropriately and solely for the purpose of advancing legitimate interests. In essence, the cross-defendants held these monies in trust and as such owed fiduciary duties to Kotler to appropriately and fairly utilize and distribute the funds.

70.     At all relevant times, Rhine and Henderson Sr. were Directors of CNE.  In this position, they owed fiduciary obligations to both CNE and its investors, including Kotler.

71.     Henderson, Jr. and Rhine breached their fiduciary duties by committing the acts set forth above, specifically by misappropriating hundreds of thousands of dollars properly belonging to CNE and by failing to properly report or account for the use of these funds.

72.     Upon information and belief, in committing the wrongful acts described herein, Henderson Jr. received substantial assistance from his father, Henderson Sr., who was aware of the fiduciary duties owed by his son at all relevant times and who provided such assistance in furtherance of a conspiracy to defraud and cheat Kotler and to misappropriate, embezzle and steal Kotler's funds. Upon information and belief, the last overt act of the cross-defendants involved in the conspiracy occurred on or about December 2010 and continuing thereafter.

73.     As a direct, legal and proximate result of the breach of fiduciary duties by the cross-defendants, and each of them, Kotler has been damaged in the loss of millions of dollars, an amount that is in excess of the jurisdictional minimum of this court.

74.     In committing the acts alleged herein, these cross-defendants acted with full knowledge and with reckless disregard for the consequences and damages being caused to Kotler.  The conduct of these cross-defendants, and each of them, was willful, reckless, malicious, fraudulent and oppressive such that Kotler is entitled to an award of punitive damages against each cross-defendant in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### (Unjust Enrichment)

### (Against All Cross-Defendants)

75.     The allegations in paragraphs 1 through 74 are incorporated herein by this reference.

76.     Henderson, Jr., Rhine and Does received hundreds of thousands of dollars from Kotler without providing a reasonable equivalent value of consideration.

77.     Upon information and belief, in committing the wrongful acts described herein, Henderson Jr. received substantial assistance from his father, Henderson Sr., who was aware of the fiduciary duties owed by his son at all relevant times and who provided such assistance in furtherance of a conspiracy to defraud and cheat Kotler and to misappropriate, embezzle and steal Kotler's funds. Upon information and belief, the last

1  overt act of the cross-defendants involved in the conspiracy occurred on or about

2  December 2010 and continuing thereafter.

3      78.    As a result, Henderson, Jr., Henderson, Sr., Rhine and Does have been

4  unjustly enriched.

5      79.    Accordingly, Kotler seeks judgment against Henderson, Jr., Henderson, Sr.,

6  Rhine and Does, ordering return of all such monies which were provided to them and with

7  which they were unjustly enriched.

8                    **SEVENTH CLAIM FOR RELIEF**

9                         **(Legal Malpractice)**

10                    **(Against Henderson, Jr. and Does)**

11     80.    The allegations in paragraphs 1 through 79 are incorporated herein by this

12  reference.

13     81.    At all times after Henderson, Jr. agreed to represent Kotler in the transactions

14  relating to Kotler's investment in the balloon project Henderson, Jr. failed to exercise

15  reasonable care and skill in undertaking to perform legal services for, and negligently and

16  carelessly preparing contracts between Kotler and CNE, negligently and carelessly

17  advising Kotler of the terms of the contract between Kotler and CNE and negligently and

18  carelessly failing to advise Kotler of the conflict of interest existing due to Henderson, Jr.'s

19  position as CFO and legal counsel for CNE, as well as counsel for the principal investor

20  (Ron Sacco).

21     82.    Had Henderson, Jr. exercised proper care and skill in the foregoing matter,

22  Kotler would have never invested in the balloon project and would have not lost over

23  $600,000.

24     83.    As a proximate and legal result of such negligence on the part of the

25  Henderson, Jr., Kotler suffered economic and monetary loss, including the loss of his

26  investment in the balloon project and the subsequent loss of insurance proceeds.

27

28

AMENDED CROSS-CLAIM

84.     Kotler has been generally damaged in an amount within the jurisdictional limits of this court.

## EIGHTH CLAIM FOR RELIEF

### (Accounting)

### (Against All Cross-Defendants)

85.     The allegations in paragraphs 1 through 84 are incorporated herein by this reference.

86.     As set forth above, the cross-defendants have misappropriated and misused funds that were held in trust by them or breached a duty of care owed to Kotler.

87.     The exact amount of the money misappropriated and misused by the cross-defendants is presently unknown to Kotler, and the exact amount can only be determined by an accounting.  As such, Kotler requests that the Court enter an order for an accounting requiring the cross-defendants to provide all financial information of every kind relating to the receipt and use of any and all monies provided to the cross-defendants from any source, including money provided by Kotler.

## NINTH CLAIM FOR RELIEF

### (Implied Equitable Indemnity)

### (Against All Cross-Defendants)

88.     The allegations in paragraphs 1 through 87 are incorporated herein by this reference.

89.     As a result of the cross-defendants' careless, negligent, reckless and knowing conduct, Kotler has been sued in this action for those damages allegedly sustained by Pilyavskaya.

90.     If Kotler is held liable to plaintiff, then the cross-defendants are obligated to indemnify Kotler for any sum, in part or in whole, that Kotler is obligated to pay to plaintiff, including any damages, special damages, general damages, punitive damages,

1  attorneys' fees and other expenses, because Kotler's liability, if any, exists only as a result

2  of the cross-defendants' acts, errors and omissions.

3  **TENTH CLAIM FOR RELIEF**

4  **(Declaratory Relief)**

5  **(Against All Cross-Defendants)**

6      91.    The allegations in paragraphs 1 through 90 are incorporated herein by this

7  reference.

8      92.    During the course of the business venture, as described above, Henderson,

9  Jr., Henderson, Sr. and Does 4-6 caused certain documents to be prepared on behalf of

10  CNE.  Such documents were purported to be prepared on behalf of an entity called Cloud

11  Nine Entertainment, LLC.  However, no such entity was ever formed with the Secretary of

12  State of Nevada, California or Delaware.   Nonetheless, cross-defendants caused the

13  preparation and submission of K1 forms for this non-existent entity.

14      93.    There exists an actual controversy related to the parties' legal rights and

15  duties under a contract or statute.  Kotler desires a judicial determination of the parties'

16  rights and duties, and a declaration as to the status of Cloud Nine Entertainment, LLC,

17  which Kotler alleges is a non-existent and improper entity.  A judicial declaration is

18  necessary and appropriate at this time under the circumstances to enable Kotler to make

19  informed decisions concerning future conduct.

20      94.    As a result of cross-defendants' preparation and filing of documents

21  purportedly on behalf of Cloud Nine Entertainment, LLC, Kotler has been damaged in that

22  he has been unable to obtain a home mortgage, due to the lenders' inability to verify or

23  ascertain future losses by investors (including Kotler) because there is no documentation

24  that Cloud Nine Entertainment, LLC has been dissolved, as it never existed.  Similarly,

25  cross-defendants refuse to provide Kotler with a final K1 form for the non-existent entity

26  further hindering his ability to secure a loan.  Cross-defendants actions also impact

27  Kotler's financial standing.

28

WHEREFORE, Kotler prays for judgment against the cross-defendants, and each of them, as follows:

1.    For general damages in an amount according to proof at time of trial;

2.    For special damages in an amount according to proof at time of trial;

3.    For punitive damages in an amount sufficient to punish and make an example of the cross-defendants;

4.    For a declaration that Cloud Nine Entertainment, LLC is a non-existent and improper entity that cannot transact business;

5.    For interest at the legal rate;

6.    For reasonable attorney's fees incurred to defend the action;

7.    For cost of suit incurred herein; and

8.    For such other and further relief as the court may deem just and proper.

Dated: June ___, 2012          **TAYLOR SETHI LACHOWICZ LLP**

By_____
      Matthew D. Taylor
Attorney for Defendant and Cross-Claimant
ALEXANDER KOTLER, M.D.

- 20 -
AMENDED CROSS-CLAIM

# Exhibit B

**From:** Ed Towle <ETowle@tdsmlaw.com> 📎
**Subject:** Cloud Nine Entertainment/ Bert Rhine
**Date:** May 16, 2012 11:06:36 AM PDT
**To:** Matthew Taylor <mtaylor@taylorsethi.com>, "John E. Andrews" <jandrews@blechercollins.com>
**Cc:** Mike Denison <MDenison@tdsmlaw.com>

1 Attachment, 535 KB

Counsel-
As you know, we have been searching for corporate records of Cloud Nine Entertainment in response to Dr. Kotler's Request to Produce. In connection with that search, Mr. Henderson received the attached letter from Bert Rhine, a former officer and director who participated in the closing down of the business.
While I encourage you to read the letter in its entirety, the critical information is that Rhine has advised us that he is in possession of approximately $35,000 of funds belonging to the corporation. As was the case with the O'Connor funds, Rhine is willing to return the funds to the corporation, or to a third party escrow, but requests a release from the parties to the lawsuit. We understand that he has a lawyer, and we have asked him to consult with his counsel. However, we need to know from you whether your clients would be willing to enter into an agreement similar to the proposed O'Connor agreement, in order to recover these funds. The objective would be to increase the amount of money held in the escrow, to be held until there is an agreement to distribute or a court order.
Please let me know at your earliest convenience.
  Ed Towle


Edmund J. Towle III
Towle Denison Smith & Maniscalco LLP
10866 Wilshire Boulevard, Suite 600
Los Angeles, California 90024
(310) 446-5445
(310) 446-5447 (fax)
NOTICE: This communication may contain privileged or other confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, transmit, disseminate, or otherwise use the information. Also, please indicate to the sender that you have received this e-mail in error and delete this message and any attachments from your computer. Thank you.

LfrRhinetoIH...df (535 KB)

**Mike Denison**

| From: | Jim Henderson [jdhjunior@aol.com] |
|---|---|
| Sent: | Monday, May 14, 2012 12:03 PM |
| To: | Ed Towle; Mike Denison |
| Subject: | Fwd: Please read this letter now. |
| Attachments: | Letter_to_Jim.docx |

[Redacted]

-----Original Message-----
From: Bert Rhine <Bert@BRMarketing.com>
To: JDHJunior-aol.com <JDHJunior@aol.com>
Sent: Mon, May 14, 2012 11:08 am
Subject: Please read this letter now.

Jim,

I spent time this weekend writing the attached letter to you.  It's
was a very difficult letter to write, but it had to be
written.  Please carefully read this letter and as I clearly outline
in the letter, I stand prepared and ready to rectify this matter immediately.

Bert

Jim,

I received your e-mail regarding account number 3982 last week.  And while I know that you're going to be both very upset and disappointed by the facts in this reply, I need to carefully explain several things to you.  This, may complicate matters further, but with Kotler's attorney apparently turning over every rock, at this point...it makes sense to me to be perfectly honest with you.

As I outline and detail this twisted story for you, it only further complicates the nightmare that was, and is Cloud Nine.  I'll begin at the beginning as I relate the situation to you.

Back in early 2007, when Kevin first approached me with the original concept of "Dining in the Sky" (remember, that was his original idea), I was intrigued by the concept.  I began helping him with graphics, logistics and the initial business plan.  The more and more I came to fully understand his concept of hanging a mini-restaurant (in a glassed in gondola) under a tethered helium balloon, the more I believed that this idea might be far too complicated and would not work.  I invited Kevin out to San Diego to go to the Wild Animal Park in Escondido where I had seen a tethered balloon ride.  Of course, as was always the case with Kevin, I had to pay for his airplane ticket.

Once he saw the tethered balloon that I was familiar with at the Wild Animal Park, he was convinced that this was the way to go.  An "amusement ride" operation on the Las Vegas strip, that had some sizzle.  Returning to Las Vegas Kevin spent every minute of every day and night (as only Kevin could) totally focused on this concept.  Kevin was sure he could and would find an investor(s) for this project.  Business plans were created, twenty to thirty versions, I lost count, and every time the concept got bigger so the costs went up as did his estimates of the potential profits, to help off-set the rising costs.

It was during this development time t Kevin began to ask to borrow money from me, to "keep him afloat," as he always liked to say, as he was working so hard for "us" on this project.  It began with small amounts, $200 here, $400 there, but then quickly increased dramatically with his constant hard luck story.  One day it was $1,000, then $1,500, as it had to pay rent.  Then $2,250 as he had to send money to Lisa and he had to have a bunch of presentations make at up Kinko's.  The truth was, he was broke and he needed money to survive and to keep this project moving forward.  Not only was he tapping me, but I'm sure he was taping others as well.

He borrowed $15,000 from a guy named Mike Marra in Minneapolis, which as it turns out, unbeknownst to me, was an investment in the new (pending) balloon attraction he was touting.  He actually promised Mike Marra a 20% position as Kevin was desperate for more cash.  The reason you never heard about Mike Marra is because at one point Kevin thought he had an investor for Cloud Nine, he negotiated a settlement with Mike to return the money to Mike and buy back his 20% interest, telling him the deal was dead.  Because Kevin didn't have the money, I loaned Kevin $12,000 to facilitate that settlement, that in Kevin's words "we had

5/14/12

to do or the pending deal that he had going would fall apart." "After all" Kevin said, "We can't very well give Mike 20% of the company for $15,000 when we're trying to raise 2 million offering a 50% stake to an investor!" At that moment, $12,500 was as much as I could do, on top of what I'd already advanced. I'm not sure where he got the rest of the money for Mike.

As I look back on it now, I'm not sure Kevin even had another investor ready to go...but he convinced me that we had to buy Mike out. All along Kevin offered me 33% of Cloud Nine. He would also try to say that the money I was giving him was my purchase of my 33% of the company, from him...and I always countered with "no Kevin, any money I'm giving you is a loan." I was earning my 33% through sweat equity. The company had no real value, so there was no way I was buying my interest. It was a LOAN! We'd go back and forth on this and of course, because he needed me, and the money I was loaning him, he end up saying, "Okay...it's a loan." We agreed that he'd pay me back upon funding...or as he would say under his breath...from his share of the huge profits we were going to make.

Kevin's constant promise to me was simple; we're going to make a fortune and he always talked about my 1/3rd share in the company which was going to be worth millions. I continued to believe in the project. Especially when he told me that he had secured a location mid-strip, right behind the Treasure Island hotel...(that was the location he said he secured and was included in the presentation to Ron in Costa Rica).

During the many months prior to finalizing the deal with Ron, Kevin continued to borrow money from me. In fact, I was the one who had to pay for the two business class tickets for Kevin and Jim Sr. to fly down to Costa Rica to meet with Ron to make the presentation. Kevin didn't have the money to pay for that. So, yet another $5,000 expense when you include his hotel room, meals and I had to supply him with cash to have in his wallet.

As it turned out, Ron was interested and Kevin called me from Costa Rica with the great news, "It's a done deal!" What a huge relief. I'd get paid back and we could move forward with Cloud Nine in Las Vegas. Kevin returned from Costa Rica with tons of enthusiasm and excitement. "We're on our way" I remember him saying. He was flying high! Once again, with his assurance to me that the deal was in place, Kevin came to me once again with his need for more money. This time he needed to pay back one of the people he recently borrowed money from in Arizona. I told him to use the pending management fee once the deal got funded by Ron, but he explained he was under the gun with this friend in Arizona and he assured me that once the money started coming in he'd start paying me back. Again, I opened up my wallet, the fool that I was.

In fact, as I later found out, there were many others who Kevin was borrowing from, not only from me. You remember he tried to "expense" some of these loans, as "prior Cloud Nine expenses" he would write on his expense report. After a couple of months of doing this you and Sr. stopped him dead in his tracks. He was even expensing his visits to his doctor as a company expense. You both finally made it clear to him that any expenses prior to the date of

Ron's commitment on the project was not the company's responsibility, that was Kevin's personally. And no more doctor bills.

But, back to details. Several weeks after Kevin returned from Costa Rica, I started to wonder in fact if this deal was really a so called "done deal". I remember how scared I got when the four of us met for lunch in Westwood, which I thought was to finalize the agreement. At lunch that day Sr. had said that Ron had changed his mind, his wife though it was a bad idea. I didn't show it, but I panicked. Knowing how much I had loaned to Kevin and now I was hearing that there may not be a deal at all. But, fortunately, later that day, Sr. talked to Ron again who changed his mind once again and the project would move forward. Whew...once again, I could breath.

I clearly remember the day when Kevin picked up cash from that produce guy, some contact of Ron's, in Los Angeles as some initial money to get things moving forward.  I expected that with Kevin taking part of his initial management fee from that cash, that he'd pay back some of the money.  But, just like every time he took his draw, he always had an excuse how he had to pay for this and pay for that, take care of Lisa her family, and he had to pay back some older loans that he still called "prior Cloud Nine Expenses." So, although I had expected that he'd be paying me back out of his on-going monthly draw, it did not happen.

And now, unfortunately, by this time the amount he was into me was well over $35,000...what a fool I was! He dangled the big carrot and reached for it. I couldn't believe that over this time period it amounted to this huge amount of money, over $35,000. The only hope I had was that we'd get this thing flying and we would indeed make money. I couldn't believe it. What was I thinking? I got swept up in the concept and like so many others, in Kevin, and allowed myself to go way beyond my comfort zone.

Anyway, now we were moving forward. But, Kevin couldn't secure the location that was in the business plan.  Kevin's major concern was that he had to find a location, any location, because if we didn't have a location, the deal would be dead and the management fees would stop. With the balloon already ordered, the scrambling for a location continued.  And, after several failed attempts at various locations including the Brett Torino fiasco, the Tropicana parking lot and several other dead-end possibilities, he came upon the Desert Land location. Although you and Alex came and looked and approved, I was very concerned that it was too far away from the pedestrian traffic...but he constantly told me to shut up about that, that we had to have a location and this is the only one we could get. He'd constantly say that his life depended on this project and that if I wanted to be paid back he had to secure a location. So, the Desert Land site become the future home of Cloud Nine.

As for those management fees, as you know, shortly after they began and with the project taking so much longer than expected, and budgets rising, we took cuts in management fees...and then shortly thereafter even more cuts. Eventually we were operating with very little in terms of salary/fees, so needless to say, he couldn't pay me back anything. We all prayed that this project would open and make money...which as we all know it did not. Again, every time he'd take a draw, no matter what size, I'd ask him about re-payment and every time there

was an excuse.

Kevin and I argued all the time in Vegas and on the phone about what we should or shouldn't be doing. I went nuts over the number of people he was hiring. I went crazy when he wanted to stay open until dawn. I couldn't believe how much he was spending on the uniforms and outfits for the pilots and the hostesses, etc, etc. Everyone was stressed out. I know you could sense the tension between Kevin and I any time the three of us talked on the phone or when you met with us in person. There were many days when I wanted to just say "screw it," and simply walk away. But well over $35,000 on the line, how could I do that?

On the one hand, I needed for Kevin and the project to continue in order to have any chance of collecting the money I'd loaned to him, but on the other hand, I was siding with you and Sr. most of the time for the sake of the business, which was the right thing to do, and that always pissed him off. "Who's side are you on?" he used to yell at me. How frustrated I was. We all were. There were no "sides" to be on, we needed to do what was right for this business.

As the project moved forward, the budget increased with every passing month, Kevin was overspending on the construction of the site and everything else, which by the time we were able to open left us with very little money to do any marketing or advertising at all. But in hindsight, as we all agreed, no amount of advertising was going to save Cloud Nine. The winds conditions in Las Vegas alone, and the number of "can't fly days" had determined that this business was going to fail.

As you know I was commuting to Vegas and finally actually rented an apartment there, at my own expense, to continue my efforts on behalf of Cloud Nine. During this time I had to forgo almost all of my other work and concentrated solely on Cloud Nine in hopes of having it be successful. And, equally as important, hoping to get paid back all the money I had loaned to Kevin. In a way, I actually felt that my loans to him were part of the overall financial investment that the others were making in Cloud Nine.

That's the abbreviated back story...now, let's move forward.

Finally, after so much time, with everything in place and we're ready to go. For the initial Inflation, since we had no idea exactly how much helium would be used or be needed, Aerophile had us order plenty of Helium, more then we needed, and in fact we didn't use it all.

As you'll remember, opening day and the launch of Cloud Nine did not go well. Sure the media and press were there, we launched the balloon, the ribbon was cut, the champagne was flowing and we were officially open, but the moment the press and everyone left, there was one major problem...no customers. A few straggled in, but that night as Kevin as I walked the property he turned to me and said "we're in deep trouble." I knew in my heart that day that he was probably right. I had a deep sinking feeling in my heart.

Within the first 30 days of our opening, everyone saw that things were not going as planned. Everyone was extremely concerned.  We were all very nervous about the viability of this project.  We were nowhere close to any of the estimated numbers that had been presented to Ron and Sr.  Customers were simply not making their way down the strip to ride in the balloon and the winds were a constant issue.  The idea of "if you build it they will come" was not holding true when it came to this balloon attraction.  Within the first few weeks we cut the staff dramatically and panic began to set in.  Everyone was nervous and upset!  I know that you and Sr. were also very concerned as well.  We needed more cash just to meet payroll and general operating expenses.  You had to go back to Ron and ask for even more money.  He agreed and helped.

In late October of 2009 we received a refund check for $8,300 for the unused Helium.  I discussed the refund with Kevin and he suggested that we open up another account and put the refund in there as a "back up."  He said, in his words, "in case this things fails, you can use that back up money as repayment of the money I owe you."  That's the account with the last four number 3982 that you referred to in your e-mail last week.

Things continued to get worse.  By late November, I'd had it with Kevin and following another huge argument I packed up and left and came back to San Diego.  I simply couldn't afford to be in Vegas any longer.  With my expenses far exceeding the small income I was receiving I couldn't afford this any longer.  I had committed years of time and efforts, tons of money to Kevin and it was plain to see that the company was in deep trouble.

In December, after four months of frustration by everyone, and a ton of "finger pointing," we all met in your offices in Santa Monica.  It was determined that Kevin was out of running the day-to-day operations.  You and Sr. asked me to take over and I simply couldn't afford to do that.  Alex said he'd go.  Needless to say, things did not improve, and actually they got worse.

I continued to stay in contact with Kevin, hoping he was going to find another job so he could pay me back, as he had agreed  he do.  But, I could hear it in his voice, he felt that I had betrayed him by constantly siding with you and Sr. on every issue and frankly, at that point, he had no income and no way to replay me.  So my hopes of recovering any money from him looked bleak and Cloud Nine was not doing well.  When he and I would talk, which wasn't often, he's always say, "you have the backup account."

Although I stayed committed to do everything I could to help the company, as you remember, I was treated horribly by Alex.  I'm sure you'll recall those two e-mails I got from him on the same day.  One that said to stay out of his Mother F---ing Business and then an hour later, one that said to go ahead and make a payment on a past due bill.  That was amazing.

Then, the major incident in March of 2010, where the envelope was destroyed and we had to shut down.  The insurance company would cover our losses, and then speaking with Ben, we no longer needed coverage, so we cancelled the liability policy as well as the workmen's comp. policy.

During the process of submitting the claims, I was further shocked, as were we all, when we learned that Alex had Anita change the sales figures to up the value of the claim...what a nightmare. Add to this the surprise of the actions by Alex. As we find out later, he registers with the secretary of state, forms a new company, takes the insurance checks and deposits them into a new account. Fortunately, although we were kept in the dark, because of my relationship with Anita, we found out what had taken place. And, I was able to convince Anita that this money belonged to Cloud Nine and was able to least get her to take that second insurance check for $360,000 that they got, take it back from Alex's new account and deposit that amount back into the Cloud Nine account, which fortunately she did in June of 2010.

Further adding to my confusion and frustration, speaking with you and Sr. on the matter of the first insurance checks received by Alex, it was told that rather than create more problems and issues, you had decided to "just let Alex keep those first set of checks" and hopefully he goes away.

When I received the refund checks from both the insurance companies, ($9,600) on our liability policy and from our workmen's comp policy ($6,200), with everything that was going on, I decided to take the same tact, I deposited those checks into the "back up" account, especially believing that there was no way we were going to continue operations based on what had go on already. We had proved the company could not make any money. I was sure that the business was going to shut and that it would be over. I even sent a three page e-mail to you and Sr. explaining why we should not continue, but as it turned out, Anita had met with Ron and convinced him that he should fly again and she could make it profitable. To all of our amazement, Ron said let's try again! I know both you and Sr. tried to talk him out of it, but he had made up his mind to try to salvage what he had started to try to recoup some of the investment. So he invested even more.

The next big event happens when Anita takes the money from Alex's account and this whole thing blows up! In those first few days of her taking the money, we talk to Anita as she was scared. We believe in our conversation with her that we have convinced her to put the money back into Alex's account. She agreed...and we believed that this is what she did.

It wasn't until just last month when she finally told me that she never actually did return the money to the account. Another surprise. I think both of us what have bet money that she had indeed returned that cash. But, no she didn't and just left town. Through you efforts, you were able to locate her in Colorado. Needless to say, we were shocked to find out what transpired.

Over the past four years, through everything that has happened, I have continued to do everything I could to help Cloud Nine, for the most part without any compensation. Which is no excuse for what's happened. I guess somehow I felt some level of entitlement. I somehow felt that the money that was set aside in this back up account would help repay all the money I had loaned to Kevin and to compensate me for my continued efforts over the years for everything I had done and was doing for Cloud Nine. Of course that was wrong.

And, after a second attempt to launch, we finally shut it down for good in December of 2010. Ron just wanted it over. He wasn't going to put in another dime. The marching orders where shut it down, payoff any outstanding invoices and be done with it. Throughout the process of shutting down, again, I did everything I could to help. I negotiated with Desert Land to let us walk away from the lease. I made the deal with Aerophile to buy back the balloon and gondola and oversaw that transaction and process. I contacted every single one of our vendors and creditors and negotiated settlements of 20 to 30 cents on the dollar on all of the past due invoices. I continue to deal with and help with everything related to Cloud Nine. All the while now selfishly using the funds in the back up account.

Upon formal closing of the company we eventually received a refund from the franchise tax board (our sales tax deposit) for $6,750 and a small refund for a double payment to XO communications for $686.00 after resolving the early termination fees, based on the two year contract Kevin had signed. Once again, these got deposited into 3982. I've also used this account personally, co-mingling with some my own personal money, as I have deposited my own cash into the account, and have made credit card payments to my Cloud Nine Credit card that I had continued to use.

And to answer your original question in your e-mail of last week, before I closed our two accounts at Bank of America, I believe I transferred that amount of $1,430 (which was in the account we used for all the credit card transactions) to 3982. Finally, when our Bank of America accounts were all closed, after the last payment to Alexandra, I transfer the balance that was in 3982 to a personal account.

I know that you are in total shock reading this letter. I'm sure that you believed that I was the one guy you could count on through this Cloud Nine nightmare. You now know the truth and the whole story. In the beginning I believed that we could be successful and because of my belief in the project, I went well beyond my comfort zone constantly lending money to Kevin in the belief that someday I'd be paid back or that we would indeed make money. Now of course, In hindsight, which is always easy, I made a huge mistake in believing that I could re-cover the money I'd loaned to Kevin, or somehow be compensated for all of my time and effort, by depositing funds to this back up account.

As guilty as Alex is of forming a new company so that he could take the insurance checks in his attempt to recover some of his investment in Cloud Nine, I was wrong by trying to recover some of the money that I had loaned to Kevin and to be compensated for all of my time and effort. As mentioned above, I guess that somehow I also justified my actions by hearing that you were just going to allow Alex to keep those first payments he received from the insurance company and that he and this whole thing would go away and you would be done with it.

I certainly realize that you are disappointed, frustrated, disgusted and angry with me, as you should be. Cloud Nine has been a total disaster and nightmare in every sense of the word. Ron lost millions, Alex and Alexandra several hundred thousand, the conflict this whole thing

created between you and Diane which resulted in your break up, Anita taking the money and leaving town (I'm still curious if you've been able to get her to give back the money) and now on top of everything else you are now hearing this horror story from me. Can this get any worse?

I'm sure once Alex's attorney sees that transfer went into account 3982, that he'll probably subpoena the bank records on that account as well and more shit will hit the fan. So you know, I'm prepared to do what has to be done to make this right. I can and will return the money. I know that you cannot forgive me for what I have done, and you shouldn't. I only ask that you try to understand what happened with my situation with Kevin (which is my own fault), which got out of hand due to the financial potential that he kept talking about. I got caught up in the hype which affected my obvious lack of judgment. I went way over my head and comfort zone on extending/lending money to him prior to Cloud Nine's funding and I somehow believed that once we were funded that he was going to immediately begin to start paying me back from the his management fees. But, as Kevin always does, he always had an answer of how he couldn't do it now, but would soon. He kept saying how once we opened the money would pour in. Will I ever collect any money from him, very doubtful. He's in China and probably can't rub two nickels together. But again, that's between Kevin and I.

Somehow, because I over extended myself in loaning him money, I somehow in my mind justified what I was doing. Somehow, with all of my time and effort that I was spending on Cloud Nine, in my mind, I was able to justify what I was doing. I realize that I've complicated things further for you and again, I apologize. I'm sure this is going to take some time for you to digest. Let me know what the next step should be and we can take the necessary actions to get this resolved, quickly.

You and Sr. have always been there for me. You both counted on me and I've let you both down. You both have every right to be angry. I'm sorry for further complicating this entire mess. This has been one of the most difficult letters I've ever had to write and I'm sure one that has been very difficult for you to read.

Bert

# Exhibit C

| | |
|---|---|
| **From:** | Matthew Taylor <mtaylor@taylorsethi.com> 📎 |
| **Subject:** | Amended Cross-Claim |
| **Date:** | June 13, 2012 9:13:56 AM PDT |
| **To:** | Ed Towle <ETowle@tdsmlaw.com>, "John E. Andrews" <jandrews@blechercollins.com>, Mike Denison <MDenison@tdsmlaw.com> |

1 Attachment, 172 KB

Counsel,

Attached, please find a proposed amended cross-claim that names both Bert Rhine and James Henderson, Sr. as additional cross-defendants in the federal action.   Please let me know within 7 days if you will stipulate to the filing of this document.  If not, we will seek leave of court to file it.



Amended Cr...pdf (172 KB)


Regards,

_____
Matthew D. Taylor, Esq.
**Taylor Sethi Lachowicz LLP**
333 S. Hope Street, Suite 2620
Los Angeles, CA 90071
T 213-254-2455/ F 213-995-5414


This message contains information from an attorney which may be confidential and/or protected by the attorney-client privilege or work product doctrine. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the content of this information is prohibited. If you have received this communication in error, please notify the sender immediately and delete the original message.

# Exhibit D

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV11-4075-CAS(Ex) | | Date | November 21, 2011 |
|---|---|---|---|---|
| Title | *ALEKSANDRA PILYAVSKAYA v. JAMES HENDERSON, ET AL.* | | | |

Present: The Honorable   CHRISTINA A. SNYDER, U.S. DISTRICT JUDGE

| Rita Sanchez | Laura Elias | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| William Hsu | Charles G. Smith |
| | David Brandon |

**Proceedings:**        SCHEDULING CONFERENCE

Hearing held and counsel are present.   The Court confers with counsel and schedules the following dates:

Request for leave to file amended pleadings or to add parties: January 13, 2012;
Factual Discovery Cut-off: April 30, 2012;
Settlement Completion Cut-off: January 27, 2012;
Last Day to File Motions: May 7, 2012;
Status Conference re: Settlement **(11:00 A.M.): February 27, 2012 (set after hearing)**;
Pretrial Conference/Hearing on Motions in Limine **(11:00 A.M.): July 16, 2012;** and
Jury Trial **(9:30 A.M.): August 28, 2012.**

cc: ADR

| | 00 | : | 09 |
|---|---|---|---|
| Initials of Preparer | | RS | |

# Exhibit E

1
2
3
4
5
6
7
8                **UNITED STATES DISTRICT COURT**

9        **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

10

11  ALEXSANDRA PILAVSKAYA, an
    individual,                                Case No. CV 11-04075-CAS (Ex)

12              Plaintiff,
                                               **ORDER RE: CONTINUANCE OF**
13         v.                                  **TRIAL AND RELATED DATES**

14  JAMES  HENDERSON, JR., an individual,
    and ALEXANDER KOTLER, M.D., an
15  individual,

16              Defendants.

17

18  AND RELATED CROSS-CLAIMS

19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## [PROPOSED] ORDER

For good cause shown, and pursuant to the stipulation of all parties, the Court orders as set forth below.

1.    The Court's November 21, 2011 scheduling order shall be amended as follow:

a.    The factual discovery cut-off date, presently April 30, 2012, shall be continued by 90 days, until July 30, 2012;

b.    The deadline for filing any dispositive motion(s), presently May 7, 2012, shall be continued by 90 days, until August 6, 2012;

c.    The Pretrial Conference/ Hearing on Motions in Limine, presently set for July 16, 2012, shall be continued by 90 days, until October 15, 2012 at 11:00 a.m.

d.    The present trial date of August 28, 2012 shall be vacated and a new trial date in this matter shall be set for November 27, 2012 at 9:30 a.m.

**IT IS SO ORDERED.**

Dated: April 16, 2012

_____

Hon. Christina A. Snyder, U.S. District Judge

2
STIPULATION RE: CONTINUANCE OF TRIAL AND RELATED DATES

1

## DECLARATION OF ALEXANDER KOTLER, M.D.

2      I, Alexander Kotler, M.D., declare as follows:

3      1.      I am a defendant and cross-claimant in the above-captioned case.  I have

4  personal knowledge of the facts set forth in this Declaration, and if called as a witness,

5  could and would testify competently to such facts under oath.

6      2.      Prior to reviewing a copy of the letter sent from Bert Rhine, a true and

7  correct copy of which is attached as Exhibit B to the declaration of Matthew D. Taylor

8  filed herewith, I was unaware that Bert Rhine had misappropriated more than $30,000

9  from Cloud Nine Entertainment.

10      3.      And, prior to reviewing the letter from Bert Rhine and the transcript from

11  the deposition of Anita O'Connor, which was forwarded to me sometime around the end

12  of May 2012, I was unaware of the extent of the role of James Henderson, Sr. in the

13  scheme to have funds fraudulently transferred to bank accounts controlled by the

14  Hendersons.

15      I declare under penalty of perjury under the laws of the State of California and the

16  United States of America that the foregoing is true and correct.

17      Executed this 5th day of July 2012, at Los Angeles, California.

18

19

20

21                                    ALEXANDER KOTLER, M.D.

22

23

24

25

26

27

28

MOTION TO AMEND PRETRIAL SCHEDULING ORDER AND
FOR LEAVE TO FILE AMENDED CROSS-CLAIM